## AMERICAN STAINLESS STEEL CO. et al.
## v. RUSTLESS IRON CORPORATION
## OF AMERICA.
### No. 3601.

Circuit Court of Appeals, Fourth Circuit.
June 11, 1934.

Charles Neave and Leonard A. Watson, both of New York City (Maxwell Barus, of New York City, and Semmes, Bowen & Semmes, of Baltimore, Md., on the brief), for appellants.

George E. Stebbins, of Pittsburgh, Pa. (Bartlett, Poe & Claggett, of Baltimore, Md., and Byrnes, Stebbins & Blenko, of Pittsburgh, Pa., on the brief), for appellee.

Seward Davis, of New York City, for the Chemical Foundation, Inc., amicus curiæ.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This suit was instituted by American Stainless Steel Company, as plaintiff in the District Court, against Rustless Iron Corporation of America, as defendant, upon two United States patents, to wit, the Clement patent, No. 1,365,091, issued January 11, 1921, upon an application filed March 12, 1917, relating to a steel alloy referred to in the trade as stainless iron, and Hamilton and Evans patent, No. 1,432,289, issued October 17, 1922, upon an application filed May 23, 1922, for a process useful in making such alloys. The bill alleged the grant of the patents, their acquisition through certain assignments by the plaintiff, and the infringement by the defendant, and prayed an injunction for an accounting for profits and damages, and an injunction from further infringement. Subsequent to the institution of the suit, the Electro Metallurgical Company was joined as party plaintiff, after it had been found by the District Court, in the consideration of a motion by the defendant to dismiss the suit, to be a necessary party plaintiff, since as part of a transaction by which it assigned the two patents in suit to the American Stainless Steel Company it retained certain interests therein.

The Clement patent is for a kind of soft steel, capable of resisting corrosion, usually called stainless iron, in order to distinguish it from the corrosive resistant hard steel formerly known in the trade. The nature of Clement's disclosure may be more readily understood if the earlier discoveries embodied in two prior patents relating to the same art are first described. The patent to Haynes, No. 1,299,404, was issued on April 1, 1919, subsequent to Clement's filing date, upon an application of March 12, 1915, which preceded Clement's application by two years; and the patent to Brearley, No. 1,197,256, was issued on September 5, 1916, upon an application filed March 6, 1916, as a continuation of an application filed March 29, 1915. These patents were discussed by the Circuit Court of Appeals of the Second Circuit in American Stainless Steel Co. v. Ludlum Steel Co., 290 F. 103, in which decision the validity of the patents was sustained. In discussing the patents and the history of the prior art, the court said:

"Haynes called his application one for a 'wrought metal article,' and Brearley his for 'cutlery.' But the object of both patentees is the same, and may be shortly described as a desire to produce what has for some years been increasingly well known under the trade-name 'stainless steel.' Although Brearley's patent date is earlier, his date of application is later, and it may be summarily held that Haynes' is the generic and Brearley's the specific patent.

"Haynes declares that his invention re-

lates to the production of wrought metal articles of manufacture 'having polished surfaces of the general character which is termed noble, in that such surfaces are incorrodible.' Brearley states that his invention relates to the production of 'cutlery or other hardened and polished articles of manufacture where nonstaining properties are desired.' Both patentees are of opinion that they have shown such desirable product by the use of a described alloy, to wit:

" 'A worked-down and hard body of an iron-chromium alloy, low in carbon and in other metals.' (Haynes.)

" 'The addition of certain percentages of chromium and carbon to iron, (producing) a steel capable of taking a polish and having the characteristics above referred to.' (Brearley.)" Page 104 of 290 F.

"The difficulty of producing a steel resistant to what is roughly called 'corrosion,' even by some of the experts testifying herein, has long been recognized. That compound of pure iron and the carbide thereof, which is steel, has itself been admixed (for many purposes) with other and more infrequent metals; e. g., nickel, tungsten, etc., and chromium. Ferro-chromium is one form of admixture; and the fact that ferro-chromium itself was well known to be peculiarly resistant to powerful acids doubtless suggested years ago that some chromium alloy might be at once useful for many of the commercial purposes of steel and yet maintain its polished luster.

"This record is replete with accounts of speculations on this subject and dissertations thereon by men confessedly skillful in their day in the arts of steel making and metallurgy. These publications have been advanced by defendant to minimize the inventive concept of Haynes and Brearley. To us they magnify it." Page 105 of 290 F.

"What the patentees told metallurgists was that stainlessness might and would be attained by the making of low-carbon and (comparatively) high-chromium alloys when, and only when, what Haynes called 'special precautions' were taken in preparation; substantially that crucibles differing from those in ordinary use should be availed of, in order to prevent the proximity and consequent admixture of carbonaceous matter during the process of melting. Haynes thought that he could use either electric or fire heat, while Brearley preferentially recommended an electric arc melting furnace. The product of both depended upon the making (under melting conditions as above set forth) of an alloy of iron in which the admixture of chromium

was in Haynes to be from 8 to 60 per cent., with a content of between 10 and 25 per cent. preferred; and in Brearley (who devoted himself to a material particularly suitable for tools) between 9 and 16 per cent.; while Haynes' carbon might run from .1 to 1 per cent. and Brearley's must be less than .7 per cent. The patented product is according to Haynes to be (inter alia) a 'hard body of an iron chromium alloy,' and according to Brearley, 'a tempered steel hardened article.' " Page 107 of 290 F.

The discovery which Clement claimed to have made was how to make an alloy that was stainless and that possessed the physical properties characteristic of soft steel. He described his invention in the specifications of his patent as follows:

"This invention relates to alloys and has for its object the provision of a composition of this character which shall be susceptible of easy working by commercially cutting, boring, turning and shaping tools and devices; which shall be highly resistant of chemical action, corrosion or oxidation, as by the action of acids, alkalis, or oxidizing atmospheres. * * *

"It should be noted at the outset that my improved alloy is not a chrome steel, the criterion of chrome steel being the possession of a high carbon content which produces a substance of such hardness and brittleness as absolutely to prevent any working or machining operations, this hardness being retained even to a red heat. My researches have shown that if the total carbon content be less than one or two-tenths per cent, this hardness is entirely absent and the resulting metal possesses exactly the qualities of chemical resistivity combined with mechanical working ability which it is the object of my invention to secure. * * *

"Essentially my improved alloy consists of iron and chromium, the chromium content being equal to at least 10 per cent of the whole, and the carbon content being not greater than two-tenths of one per cent of the whole and preferably not over about one-tenth of one per cent."

Clement also described a process for the manufacture of the alloy, in which he emphasized the necessity of keeping the material as free as possible from oxides.

The claims of the patent in suit are as follows:

"10. An alloy containing iron and chromium wherein the chromium constitutes not less than 10% and the carbon less than .2 of

1% of the alloy and substantially free from oxids.

"11. An alloy of iron with upward of 10% of chromium which is ductile and malleable when cold and susceptible of machining and substantially free from oxids."

By disclaimers filed by the American Stainless Steel Company on February 9, 1932, and by the Electro Metallurgical Company on April 8, 1932, so much of the subject-matter of claims 10 and 11 as includes a product having a content of carbon over about .1 of 1 per cent. was disclaimed so as to limit the claims to an alloy having a carbon content not over about .1 of 1 per cent.

It is said by the plaintiff that the contribution which Clement made was the disclosure of a noncorrosive alloy, capable of use in the soft steel field, and it could be produced by keeping the chromium above 10 per cent., the carbon at not to exceed about .1 of 1 per cent., and using extreme care, in the process of manufacture, to deoxidize the molten bath before pouring. The particular advantage of the product was that the alloy was ductile and malleable when cold. The District Court, as will appear from the opinion, 2 F. Supp. 742, held that the Clement patent was invalid by reason of the disclosures of Haynes (which was not cited against Clement in the Patent Office), and also by reason of the prior use of the alloy by the General Electric Company for lead-in wires for electric lamps and for turbine blades. We agree with the conclusion that the patent is invalid, and have found it necessary to consider in this respect only the evidence of prior use.

In 1910, the General Electric Company was seeking a substitute for platinum, which had theretofore been used in the manufacture of lead-in wires in electric lamps, because it was resistant to corrosion and had approximately the same coefficient of expansion as glass. Chemists and metallurgists in the research department of the company, making use of the known fact that chromium alloys are resistant to corrosion, made a series of heats or melts for the manufacture of alloys of iron and chromium, keeping the carbon content at a low figure and using an electric furnace so as to make a material substantially free from oxides. This work was carried on between September 8, 1911, and November 13, 1911. At first analyses were not made to determine the carbon content of the ingredients, but the materials were selected so as to minimize this element. The chromium used contained no carbon and the iron very little. The alloys produced were ductile and malleable with difficulty when cold. The results were considered sufficiently promising that the work was continued on a larger scale through the year 1912. A process was used to secure a product free from oxides similar to that disclosed in the Clement patent. Some 28 heats were made and analyses of the results were recorded. They showed that the chromium content varied from 13 to 29 per cent., and the carbon content from .1 to .5 per cent. In the latter part of 1912, a large number of Christmas tree lamps were made with the new lead-in wire, and over 100,000 lamps were shipped out to the trade. A number of lamps of 35 to 40 watts were also made. In all, about 50,000 feet of wire was shipped from the laboratory at Schenectady to the lamp works at Harrison. The record shows that the wire used in most, if not in all, of these lamps ranged in carbon content from .15 per cent. to .50 per cent., and the majority of the heats made during this period produced alloys whose carbon content exceeded the Clement range. There were, however, three heats within the range of the patent as originally filed. Two of these had a carbon content of .1 and .11 per cent., respectively, and the other a carbon content between .1 and .2 per cent. The use of the wire was discontinued in the latter part of 1912 because of the development by the laboratory of another wire which was deemed more satisfactory in certain respects.

It is suggested by the plaintiff that all of these transactions amounted to nothing more than an experiment which was not anticipatory of Clement's invention. But the work of the General Electric Company did not stop at this point. The head of its research laboratory determined to test the alloys used in the manufacture of the lead-in wire as material for the manufacture of turbine buckets or blades. Some of the alloy was forged into buckets at Lynn, and one of these was produced in evidence in this case. It was then determined to make the alloy in larger quantities, and between July, 1914, and April, 1915, some 18 heats were made at Schenectady in a Heroult furnace having a capacity from 500 to 800 pounds. Between 8,000 and 10,000 tons of the material were made, and it is conceded in the case that most of these heats resulted in an alloy containing about 15 per cent. of chromium and about .1 of carbon— that is, most of them corresponded in chromium and carbon content to Clement's specification. The materials thus made were sent from Schenectady to Lynn. There the work was concerned specially with small turbines, the larger turbines being made in Schenecta-

dy. The material was satisfactorily tested at Lynn for corrosion, and some buckets were forged from it. The alloy, however, was unsatisfactory in that it developed seams or cracks, and the work at Lynn did not reach the point of putting any buckets or blades into a turbine for testing, and in the middle of 1915, the work at Lynn was discontinued, and the buckets that had been made were scrapped so that there would be no danger of their getting into use at any later date.

In the meantime, however, the research work was going ahead at Schenectady and it was believed by the metallurgist that the difficulty with the material shown by the seams or cracks was due to incorrect forging, and a report to this effect was made in December, 1914. Following this in 1915, about 3,500 pounds of the alloy were cast and forged into bars, which were machined into turbine blades and built in a 10,000-kilowatt turbine that went into operation in April, 1916. The alloy produced was given the name "Turbuck." This turbine operated until 1919 and was then opened for inspection and the blades were studied. There was no rust upon them, but 35 out of 300 were found to have seams in them, and they were replaced with nickel steel blades, as there was none of the alloy on hand and it could not be produced without difficulty. The turbine continued in use until 1923, when a second inspection was made, whereupon the chromium iron buckets were found to be in excellent condition, although some of the steel buckets showed a deterioration. The turbine was closed again and was continuously used until the time of the trial. Two of the blades from the turbine were produced as physical exhibits. The General Electric Company seems to have made no more of the alloy after 1915, but since 1925 it has used for turbine blades an alloy known as Ascoloy, manufactured by a licensee under the Haynes patent, and substantially the same in composition as the Turbuck metal. The Ascoloy metal was only adopted after extended tests as to its efficiency.

▇▇ The plaintiff concedes that the material in some of the lead-in wire and in the turbine blades manufactured by the General Electric Company possessed the same composition and the same properties as the alloy disclosed by the Clement patent. But the plaintiff contends that this prior use by the General Electric Company was merely accidental, without appreciation of the problem involved which Clement solved or of the results which it had itself attained, and that the metal produced by the General Electric Company was so affected with seams or cracks in the material, and its use even in the turbine was given up under such circumstances that the whole work amounted to nothing more than an abandoned experiment. The rule undoubtedly is that a prior use, in order to negative novelty in a patent, must be something more than an accidental or casual one. It need not have been persisted in, and the thing produced need not have gone into commercial use; but at least the discovery must have gotten beyond the experimental stage and have become complete, and the inventor must have understood and appreciated that it was capable of producing the results sought to be accomplished. Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821; Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610; Buser v. Novelty Tufting Machine Co. (C. C. A.) 151 F. 478; Carson v. American Smelting & Refining Co. (C. C. A.) 11 F. (2d) 766, 770, 771; H. K. Regar & Sons, Inc., v. Scott & Williams (C. C. A.) 63 F. (2d) 229; Virginia-Carolina Peanut Pickers Co. v. Benthall Machine Co. (C. C. A.) 241 F. 89; Standard Sanitary Mfg. Co. v. Iron City Sanitary Mfg. Co. (C. C. A.) 222 F. 671; United States Mineral Wool Company v. Manville Covering Co. (C. C. A.) 125 F. 770.

In applying this rule in the pending case, we are aided by the fact that there is no real dispute as to the circumstances of prior use upon which the defendant relied. It is admitted that the General Electric Company actually made an alloy wherein the chromium constituted not less than 10 per cent. and the carbon about .1 of 1 per cent. There is some suggestion in the argument that the alloy so composed was not substantially free from oxides as required by claims 10 and 11 in suit; but an examination of the record convinces us that the evidence is to the contrary. We think it is clear also from the reports of the work done by the employees of the General Electric Company that the chemists and metallurgists engaged in the work had in mind the same problem which Clement strove to solve, and understood that, in order to accomplish the purpose in mind, it was necessary to use the ingredients in the proportions which Clement subsequently specified. There were defects in the material, it is true, particularly in that which was used at Lynn where small turbines were constructed; and this material was destroyed because of its defective condition. The difficulty, however, was largely remedied in the work done at Schenectady on the larger turbine where different forging methods were employed; and it must be borne in mind that work in metals of the sort here

undertaken is frequently attended with difficulty. Clement himself, in the year following the grant of his patent during which he survived, had great difficulty, as the evidence shows, in reproducing his process. We think it must be said, therefore, that the whole result achieved by Clement had been previously worked out in the laboratory of the General Electric Company, and it is immaterial, as the cited cases show, that, because of the difficulty in making the alloy, or for other reasons, its use was discontinued and not resumed until ten years later. See Corona Cord Tire Co. v. Dovan Chemical Corp., supra.

The Hamilton and Evans patent discloses a process or method of reducing metals and making alloys. The first claim of the patent, which alone is in suit, reads as follows: "The process of making rust-resisting metal which consists in charging a furnace with iron, melting the same, forming a slag thereon and adding to said slag ore containing chromium oxide in the presence of a thermo-reducing agent, whereby the ore is fused, the oxide is reduced and the resulting chromium descends into the molten metal beneath the slag."

The patentees state, in substance, in their specification, that, if chromium oxide ore, together with aluminum or some other thermo reducing agent, such as silicon or magnesium, is introduced into a suitable slag on top of molten iron in an electric furnace, the entire body of the ore, with its fusible components, is fused. The chromium oxide and iron oxide are reduced, and the chromium and iron thus formed descend into the molten metal, while the other components of the ore are retained in the slag, which not only acts as a flux, permitting the fusion of the ore, but protects the molten metal beneath from contamination by the carbon electrodes.

The District Court found the Hamilton and Evans patent invalid by reason of the disclosures of the Price patent, No. 865,609 of 1907, which was not cited against Hamilton and Evans in the Patent Office, and with this conclusion we also agree. The Price patent relates to a process of producing low carbon ferro-chrome and similar alloys, using ferro-silicon as a reducing agent. The first part of the process relates to the making of ferro-silicon which is used as the reducing agent for the chromite in the second stage of the proc-

ess. In the latter, the ferro-silicon reducing agent is mixed with chromite ore and lime, and the mixture is fed into the furnace. An electric current is applied which fuses the mixture and brings about a reaction, whereby the chromium and iron of the ore are reduced, and the reduced metal accumulates as molten metal in the bottom of the furnace and a slag forms on the surface. The operation is a continuous one in which, from time to time, further amounts of the mixture of ore, ferro-silicon, and lime are charged on top of the slag and the molten metal and excess slag are tapped off at different levels as may be required.

The similarity of this process, after it is under way, to that of Hamilton and Evans, is obvious. The plaintiffs do not deny that the Price patent discloses the process steps of claim 1 of the Hamilton and Evans patent, but attempt to distinguish the patents in other respects. It is emphasized that the manufacture of ferro-alloys differs from the manufacture of alloy steels in certain respects, such as the care required in the selection of raw materials, the permissible limits of variation in the composition of the materials, the methods of smelting and pouring, etc.; and it is said that the Price patent relates to a process for making ferro-chromium which is one of the raw materials used for making steel, whereas the first claim of the Hamilton and Evans patent relates to a process for making iron or steel, because the first step in the process is described in this claim as "charging a furnace with iron," and the specification speaks of charging the furnace with iron scrap. Hamilton and Evans, however, state in their specification that their method may be employed in the production of ferro-chrome by charging a furnace with ferro-chrome instead of iron scrap. The use of substantially the same method in the production of ferro-chromium was, as we have seen, disclosed by Price, and it does not appear from an examination of the evidence that it required invention to apply this method in the process of making alloys of steel or iron. A somewhat similar situation was found to exist in Kissock v. Duquesne Steel Foundry Co. (C. C. A.) 37 F.(2d) 249. We therefore conclude that the Hamilton and Evans patent is also invalid.

The decree of the District Court is affirmed.