**The AMERICAN ORIGINAL CORPORATION, Appellant,**

**v.**

**JENKINS FOOD CORPORATION, etc., Sea Watch International Ltd., etc., H. Allen Smith, Inc., etc., et al., Appellees.**

**Appeal No. 85-1281.**

United States Court of Appeals, Federal Circuit.

Sept. 26, 1985.

Rodger L. Tate, Banner, Birch, McKie & Beckett, Washington, D.C., argued, for appellant. With him on brief was Harold J. Birch.

Thomas T. Alspach, Franch, Earnest & Cowdrey, P.A., Easton, Md., argued, for appellees.

Before FRIEDMAN, Circuit Judge, NICHOLS, Senior Circuit Judge, and KASHIWA, Circuit Judge.

FRIEDMAN, Circuit Judge.

In this appeal from a judgment of the United States District Court for the Eastern District of Virginia, the appellant The American Original Corporation (American), which was the successful plaintiff in a patent infringement suit, challenges (1) the adequacy of the damages awarded, (2) the refusal of the district court to treble the damages and to award attorney fees, and (3) the ruling of the district court that the appellees did not violate, and therefore were not in contempt of, the court's earlier order enjoining infringement of the patent. We affirm.

I

A. The invention in this case involves a method of automatically eviscerating shelled shucked claims in preparation for their further commercial processing into fried clam strips. Shelled shucked clam meat consists of two parts: the belly, or entrails, and the remainder of the clam, called the tongue. Although edible, the belly is separated from the tongue during commercial processing to retard spoilage. For many years clams had been eviscerated by hand.

Both American and the appellees are in the business of shucking and eviscerating clams. The appellees are three interrelated

companies and two officials of those companies, Walter Quimby and Lawrence De Marino, who formerly were employees of American. We refer to the appellees collectively as "Jenkins."

The prior art process used to eviscerate, or debelly, clams is exemplified by United States Patent No. 3,688,344 to Carlson (Carlson patent). In that process shucked clams are drawn through a tube one at a time. At the end of the tube they are entrained in a high-speed stream of water and air, and hurled against a hard surface. The Carlson patent teaches that the bellies were separated from the tongues as a result of the severity of the impact against the surface.

In 1975, American obtained a license under the Carlson patent and built several machines according to its teachings. Employees of American noticed, however, that although the bellies were removed from the tongues, the tongues were mutilated and deeply bruised, rendering them less suitable for commercial processing. In an effort to cure this deficiency, American's president, John Marvin, hypothesized that, contrary to the teaching of the Carlson patent, the clams were debellied by the stresses imposed on them as they were entrained in the air and water stream. According to Marvin's theory, the already debellied clams were being needlessly damaged by the superfluous impact against the hard surface.

To test this theory, Marvin had the impact surface removed from one of the systems. He found that even though the clams no longer impacted upon a surface, they were still debellied. On September 18, 1977, Marvin filed an application on his process, which matured into U.S. Patent No. 4,148,112 (Marvin patent), issued on April 10, 1979.

Prior to the issuance of the Marvin patent but subsequent to the filing of the application for it, Quimby and DeMarino resigned from American to join the Jenkins Company, which then began to convert from manual debellying of clams to automatic mechanical devices. It began to operate its first automatic clam eviscerator in April 1979.

B. American filed this suit in October 1979, alleging that Jenkins was infringing the Marvin patent. Jenkins responded that the patent was invalid, but admitted that if it were valid, it was infringed.

After a trial on validity, the district court upheld the Marvin patent, and enjoined Jenkins from further infringement. *American Original Corp. v. Jenkins Food Corp.*, No. 79–950–N (E.D.Va. June 4, 1981). On Jenkins' appeal, the Fourth Circuit affirmed and remanded the case for a determination of damages. *American Original Corp. v. Jenkins Food Corp.*, 696 F.2d 1053, 216 USPQ 945 (1982).

During the intervening period, Jenkins attempted to comply with the injunction by modifying its eviscerating devices so that the clams struck a solid surface. It also began to pay royalties under the Carlson patent.

American sought damages not only for past infringement, but also for Jenkins' alleged continued infringement of the Marvin patent in contempt of the injunction by use of its modified eviscerating devices.

Following the trial on damages, the district court found (1) that a reasonable royalty of $300 per week, or a total of $33,600, "is the measure of [American's] damages"; (2) that American "is not entitled to have said damages trebled or increased [under 35 U.S.C. § 284 (1982)] because there was no willful or deliberate infringement or bad faith on the part of defendants"; (3) that "[t]he facts found by the Court as the basis of a denial of treble damages are equally as applicable to the request for attorney's fees" and require its denial; and (4) that Jenkins was not "infringing the Marvin 112 patent" by operating its modified eviscerating devices and therefore did not violate the injunction and was "not in contempt of court."

In this appeal, American challenges each of those rulings.

## II

The determinations of the district court that American challenges are largely dependent on difficult factual conclusions. They reflect the district court's evaluation of conflicting evidence, both testimonial and documentary, that addressed the strongly disputed questions that were litigated in the trial of the damages and contempt issues. Under Rule 52(a) of the Federal Rules of Civil Procedure, those factual findings are binding on us unless they are "clearly erroneous." "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City,* — U.S. ——, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Although American, at least in its reply brief, pays lip service to this principle, its attack upon the district court's factual determinations in actuality is but a reargument of the case it lost on the facts in the district court. It discusses in detail the evidence supporting its version of the facts, and largely ignores or downplays the contrary evidence that the district court accepted. It also ignores the district court's credibility determinations. American makes no serious attempt to show that particular findings are clearly erroneous, but rather contends that the district court should have decided the factual issues the other way.

As the Supreme Court recently stated in *Anderson v. City of Bessemer City,* however:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous....

This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

*Id.* 105 S.Ct. at 1512 (citations omitted).

It is in the light of the foregoing principles that we review American's challenges to the district court's findings and conclusions.

## III

The district court pointed out that since American had not licensed the Marvin patent, there was no existing royalty rate. It therefore "turn[ed] to the best evidence of what a reasonable royalty would produce—that is, royalties paid by others for use of a comparable patent in the industry." That was the amount, the court concluded, that "a licensee such as defendants and a licensor, such as plaintiff, would have agreed upon, at the time the infringement began...." The court stated that "the Carlson patent was a similar or comparable system, and one used by many in the industry. The sums paid by plaintiff to Carlson, by defendants to Carlson, and by others to Carlson, are evidence of what a fair royalty would be. These were negotiated sums in arms length transactions."

The court then determined that $300 a week "would be a reasonable royalty to be paid by defendants to plaintiff...." It found that "[American], up until it cancelled its agreement, was paying Carlson $300.00 per week for the use of the Carlson impact extractors. [Jenkins was] paying Carlson $250.00 per week, and evidence established others were paying $300.00 per week for the Carlson impact extractors."

American challenges this conclusion on two grounds. It contends: (A) that the proper measure of damages is not a reasonable royalty, but the cost savings Jenkins allegedly realized by using the patented Marvin process, which it calculates as ranging from $137,200 to $234,818 (depending upon the basis on which the royalty was set); and (B) that if a reasonable royalty is the proper basis for determining damages, the total amount of that royalty should be

$117,409 rather than the $33,600 the district court awarded.

A. American's first argument, that it demonstrated that significant cost savings resulted from the use of the Marvin patent, is based on a comparison of the operations under the Carlson and Marvin patents during a period when it asserts it was using both processes simultaneously. Prior to October 1976, American used the Carlson process (which eviscerated the clams by hurling them against a hard surface) in its Grasonville and Willis Wharf plants. American removed the Carlson impact extractor from both plants in the fall of 1976, and substituted the Marvin process.

American contends that there was a two- or three-month period during which it used the Marvin process in its Grasonville plant but continued to use the Carlson system in its Willis Wharf facility, and that the evidence established that the operation of the Marvin process during that period produced substantial savings over the Carlson process. It relies upon the testimony of Steven DeVore, its executive vice president, and Richard Adams, the manager of the Grasonville plant. Both witnesses testified that there was such an overlapping period of simultaneous use, and that the Marvin system had lower costs.

The district court rejected this contention. It found:

> Considering all of the facts before the Court, the Court has determined that [American] has not established that such lapse of time existed, and that the testimony of DeVore of such a lapse of time in October, November and December 1976, between the removal of the Carlton [sic] system at Grasonville and Willis Wharf is not supported by the record and may not be considered by the Court. Nor is there other credible support for DeVore's testimony of cost savings.

The court pointed to a number of facts that supported its conclusion that American "has not established that [there was] such a lapse of time" during which the two processes were operated simultaneously. The evidence the court described included stipulations by the parties (which American now says were erroneous and should be disregarded) that the Carlson system at both American plants "were taken out on October of 1976," that "[i]n October 1976 [American] modified the original Carlson [device] at Grasonville and Willis Wharf by removing Carlson's 'impact extractors,'" and that "[o]n October 21, 1976 Marvin wrote Carlson a letter ... advising that [American] had no further need for the loan of his two 'impact extractors'. [American] then ceased making royalty payments to Carlson." The court also noted documentary evidence that in October 1976, American returned its two Carlson impact extractors and ceased making royalty payments to Carlson.

American ignores the district court's finding that DeVore's testimony was not credible, and attempts—we conclude unsuccessfully—to explain away the extensive documentary evidence upon which the district court relied. American has not established that the district court's finding that American had not operated the two systems simultaneously in the fall of 1976, was clearly erroneous.

Although American correctly notes that the Fourth Circuit described the patented Marvin eviscerator as "a vast improvement on the Carlson installation," and "a real improvement in the process of eviscerating clams," the court made those statements in connection with its review of the district court's determination that the Marvin patent was valid, and those statements were based on a different record than the one before us. They do not compel a finding that the Marvin system produced cost savings over the prior art. Indeed, if the Marvin process produced the significant cost savings that American ascribes to it, one wonders why, when American offered a license under the Marvin patent to the members of the seafood processing industry, no one in the industry took a license and apparently only one person even responded to the offer.

B. Alternatively, American contends that if a reasonable royalty is the proper measure of damages, the district court should have awarded substantially more than the $300 a week rate it adopted. As noted, the district court relied on the $300 weekly royalty that American had paid Carlson, the $250 weekly that Jenkins had paid Carlson, and the evidence in the record that other licensees also had paid Carlson $300 per week.

American argues that the court should have based its damage award on higher royalties that other licensees paid for the Carlson patent. American contends that because of the dates of these various agreements, the higher royalties more accurately reflect the rate a willing licensee and a willing licensor would have agreed upon at the time Jenkins began infringing.

■ The licenses upon which American relies do not compel the conclusion that the district court erred in finding that a reasonable royalty would have been $300 a week. American's license payments to Carlson occurred just prior to Jenkins' period of infringement. Jenkins' payments occurred just after. One of the license agreements American refers to was for two impact extractors at $300 per week per extractor, a royalty which American urges be viewed as a "quantity discount" not applicable to Jenkins' operation of a single eviscerator. The record contains little or no evidence of the circumstances surrounding the other licenses, which were entered into well before the period of infringement.

The district court's finding that a reasonable royalty would have been $300 a week is not clearly erroneous. Here, as with the other issues in the case, the record contains conflicting evidence. We cannot say that the district court erred in rejecting American's evidence of what a reasonable royalty would have been.

The fact that in 1979, Carlson, upon asserting that the eviscerator Jenkins was using infringed the Carlson patent, offered Jenkins a license at $504.80 per week, does not establish that the latter amount was the minimum reasonable royalty. A royalty at which a patentee offers to license his invention, particularly when coupled with a claim of infringement, is not necessarily the same rate as that upon which a hypothetical willing licensee and willing licensor would agree. Cf. Hanson v. Alpine Ski Valley Area, Inc., 718 F.2d 1075, 219 USPQ 679 (Fed.Cir.1983) (effect of offered license rate with respect to determination of an established royalty). When Jenkins finally agreed to a license under the Carlson patent, it was for $250 per week, substantially less than the rate originally offered.

IV

■ Under 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed." One of the grounds upon which courts increase damages is that the infringement was willful and deliberate. Cf. Rosemount, Inc. v. Beckman Instruments, Inc., 727 F.2d 1540, 1547, 221 USPQ 1, 8 (Fed.Cir.1984). That is the basis upon which American seeks treble damages.

■ The decision whether to increase damages is within "the discretion of the trial court, ... and will not be overturned absent a clear showing of an abuse of discretion." King Instrument Corp. v. Otari, 767 F.2d 853, 866, 226 USPQ 402, 411 (Fed.Cir.1985).

In refusing to increase the damages in this case, the district court stated:

> The evidence fails to establish any useful or deliberate infringement by [Jenkins], or a copying of Marvin's patent.... A reading of the whole record fails to disclose any lack of good faith in the actions of [Jenkins], or any deliberate or unlawful intent to infringe. The evidence does not justify a finding of treble damages, or any increase in the damages awarded....

American attacks this determination on a number of grounds, many of which rest upon its version of the facts rather than the contrary version the district court adopted. Here, as with the issues concern-

ing the amount of damages, we cannot say that the district court's findings are clearly erroneous or that the district court abused its discretion in refusing to increase the damages.

The ultimate issue on this aspect of the case is whether Jenkins' infringement was willful or reflected a good faith belief that its method of operation did not infringe the Marvin patent. American relies upon several grounds that allegedly establish that the infringement was willful.

■ A. American contends that Jenkins copied the Marvin process. The record contains evidence, and American does not dispute, that Jenkins began developing a mechanical eviscerator in 1978. The parties stipulated that Jenkins installed its original eviscerator on April 13, 1979. The Marvin patent issued at about the same time, on April 10, 1979. Jenkins therefore could not have copied the Marvin patent in designing its original eviscerator.

Although some evidence suggests Jenkins may have been aware that American had a pending application (although it is unclear that it was aware of the precise claims asserted), "[t]o willfully infringe *a patent*, the patent must exist...." *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236, 224 USPQ 418, 425 (Fed. Cir.1985) (emphasis in original). We have no basis to reject the district court's finding that "[t]he evidence fails to establish ... a copying of Marvin's patent."

■ B. American asserts that Jenkins violated an affirmative duty to exercise due care to avoid infringement, "includ[ing] obtaining a detailed, competent legal opinion of patent counsel before" commencing its activities, and improperly failed to obtain an opinion from its own patent counsel regarding the effect of the Marvin patent upon its operations until after American filed suit in October 1979, some six months after the patent issued. Although the presence or absence of an opinion of counsel is pertinent evidence in determining good faith, that determination is based on "the totality of the circumstances present-

ed in this case...." *Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1390, 219 USPQ 569, 577 (Fed.Cir. 1983); *see also King Instrument*, at 867.

■ The finding of the district court that Jenkins acted in good faith without intent to infringe the Marvin patent is supported by the record and is not clearly erroneous. The Marvin patent was brought to the attention of Quimby (Jenkins' plant manager) in June 1979 by Gerald Blakeslee, a metal fabricator working with Jenkins on its eviscerator and an inventor "who was" himself, the district court found, "represented by patent counsel." Quimby testified that, upon being informed that in Blakeslee's opinion the eviscerator then in use by Jenkins infringed the Marvin patent, he "urged [Blakeslee] to proceed rapidly to aid them in avoiding a lawsuit involving [the] Marvin [patent]." Jenkins altered its system in the hope of avoiding infringement. We cannot say that the district court improperly interpreted Jenkins' actions as a genuine attempt to avoid infringement.

American contrasts the activities of Jenkins with respect to the Carlson patent and the Marvin patent. After the Marvin patent issued and prior to American's filing suit, Jenkins sought and obtained an opinion letter from counsel on whether its eviscerator infringed the Carlson patent. The absence of a similar inquiry with regard to the Marvin patent, American argues, shows that Jenkins acted in conscious disregard of it.

■ As American's counsel admitted at oral argument, however, prior to filing the present suit American never informed Jenkins that in its opinion Jenkins was infringing the Marvin patent. In contrast, Carlson's representative asserted in a May 31, 1979 letter to Quimby that Jenkins' "unauthorized construction of machinery which duplicates the Carlson method constitutes patent infringement." Jenkins' counsel responded with a letter denying infringement. In these circumstances, the failure of Jenkins to obtain an opinion of patent counsel before starting to operate

its eviscerating process does not establish that Jenkins' infringement was willful.

## V

■ American also contends that this is an "exceptional case," so that it is entitled to attorney fees under 35 U.S.C. § 285 (1982). The ground upon which it seeks those fees, however, is the same ground upon which it seeks treble damages, namely, that Jenkins' infringement was willful.

In rejecting the claims for attorney fees, the district court stated:

Where the validity of the patent is doubtful, where competent counsel has advised the patent is not valid, where the party has acted in good faith in contesting the validity of the patent and where defendants made changes in their system in an effort to avoid infringement and there is no willful or wanton infringement, an exceptional case does not exist entitling a litigant to award of attorney fees against the other litigant. The facts found by the Court as the basis of a denial of treble damages are equally as applicable to the request for attorney's fees.

Our holding in Part IV that the district court properly ruled that the infringement was not willful, also requires affirmance of the district court's denial of attorney fees.

## VI

■ American's final contention is that the district court incorrectly held that Jenkins' modified eviscerator did not infringe the Marvin patent and that Jenkins therefore was not in contempt of the district court injunction enjoining infringement of that patent. That determination, like most of the others we have discussed, is a factual one that cannot be overturned unless clearly erroneous.

After the district court entered its injunction, Jenkins modified its eviscerator to interpose a solid wall across the path of the flowing stream of water containing the clams. Unlike the Carlson process, however, the clams struck the wall under water. Jenkins hoped this would avoid the claims of the Marvin patent, and yet prevent the excessive damage to the clams that the Carlson process had caused. Upon making this modification, Jenkins began paying royalties under the Carlson patent.

In holding that Jenkins was not in contempt of its injunction by using this new system, the district court stated:

The system now operated by [Jenkins], and operated by them since the injunction accords with the Carlson patent; i.e. of impact of the clam against a solid surface.... While [American] disagrees that there is substantial impact in the present system operated by [Jenkins], the evidence clearly satisfies the Court that the impact requirement of the Carlson patent is fully met. Since the injunction, [Jenkins] has continued to use and [is] still using the Carlson impact for debellying, all within the Carlton [sic] patent. [Jenkins is] not infringing the Marvin 112 patent.

American challenges this determination on the ground that "[t]he clam-damaging impact taught by the Carlson patent was not reintroduced into the system. All Jenkins has done is reintroduce an inconsequential impact ... which does not damage the clams and which has no effect whatsoever on the evisceration process" (emphasis omitted). According to American, "if clams are subjected to hydraulic evisceration in a shear zone, which is *not followed* by a violent, head on, clam damaging impact against a solid surface, ... then it is clear that the Marvin claims still embrace such a process" (emphasis in original).

The Marvin patent does not have the broad scope American urges. Claim 1 of that patent, the only independent claim upon which American relies, recites "[a] method of separating the belly of a clam from the remainder of the clam ... by introducing one whole clam body at a time to a fluid shearing zone ... in such a manner that ... [a] high velocity stream of fluid creat[es] forces sufficient to shear the bellies from [the] whole clam bodies."

The district court found that during the development of the Marvin eviscerator, "[i]t was determined that the eviscerating of the clam bellies occurred in the line before the clam reached the impact area; that the velocity of the stream of fluid (water) created a force sufficient to shear the bellies from the clam bodies.... Marvin's intention was to eviscerate the clams by exposing them to a shearing hydraulic force, which was in fact, a part of the Carlson invention, but Carlson 'neither understood nor appreciated that substantially all shearing was by hydraulic force, rather than by impact.'" (*quoting American Original*, 696 F.2d at 1059, 216 USPQ at 950).

There were introduced before the district court the results of tests showing that in Jenkins' allegedly infringing modified device, although 97 percent of the clams were eviscerated, only 50 percent were eviscerated through the fluid stream and 47 percent were eviscerated by the underwater impact. This is in sharp contrast to test results of the Marvin device, which eviscerated 90 percent of the clams in the fluid stream. The district court credited these results, and we have no basis on which to disregard them. The court further found that an evisceration rate of at least 90 percent was needed to make a clam evisceration process commercially feasible.

These test results show that a key element of the accused Jenkins eviscerator is the underwater impact. That impact is therefore substantial and not "inconsequential"; the process cannot function effectively by relying solely on the fluid stream evisceration the Marvin patent recites. Contrary to American's contention, to avoid infringement Jenkins need not "reintroduce into the system" "the clam-damaging impact" of Carlson. It need only use a method other than that which the asserted claims cover.

## CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED.