**UNION CARBIDE
CORPORATION, Plaintiff,**

v.

**TARANCON CORPORATION and
Gregorio Tarancon, Defendants.**

**No. 1:86–CV–1811–RHH.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 30, 1990.

See also 682 F.Supp. 535.

John T. Marshall, David Ross, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiff.

Ezra Sutton, Woodbridge, N.J., for defendants.

## ORDER

ROBERT H. HALL, District Judge.

The above-styled action was tried before the court between March 5 and March 13, 1990. Plaintiff claims that defendants infringed plaintiff's U.S. Patent No. 3,998,-180 (the '180 patent). Plaintiff asserts that the infringement was willful, entitling plaintiff to an award of attorney fees under 35 U.S.C. § 285. Plaintiff also brings state law claims for misappropriation of trade secrets, breach of contract, unfair competition and tortious interference with contractual relations. Plaintiff has withdrawn its request for money damages and seeks only injunctive relief and attorney fees.

This court's jurisdiction is predicated on the following code sections:

1. Patent Infringement and Unfair Competition: 28 U.S.C. §§ 1338(a) and (b); 28 U.S.C. § 1331.
2. Attorney Fees: 35 U.S.C. § 285.
3. Costs: 35 U.S.C. § 285, 28 U.S.C. § 1920; Fed.R.Civ.P. 54(d).

Plaintiff's state law claims are considered in light of this court's pendent jurisdiction.

For the reasons stated in full below, the court finds:

1. That defendants literally infringed plaintiff's '180 patent;
2. That the infringement was not willful;
3. That plaintiff is not entitled to an award of attorney fees;
4. That defendants misappropriated plaintiff's multiple dwell fluorination method (MDFM) trade secret;

5. That defendant Tarancon breached his contract not to disclose Union Carbide trade secrets;

6. That plaintiff failed to prove by a preponderance of the evidence that defendants are liable for unfair competition; and

7. That plaintiff failed to prove by a preponderance of the evidence that defendants tortiously interfered with plaintiff's contractual relations.

## FINDINGS OF FACT

### I. General Facts

The following general facts apply to all the claims in this action.

### A. The Parties

Plaintiff Union Carbide Corporation ("Union Carbide") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of Connecticut. Union Carbide is and has always been the owner of all right, title and interest in and to United States Patent No. 3,998,180 (the " '180 patent"). The '180 patent was duly and legally issued to Union Carbide as the assignee of the inventors Hawkins, et al.

Defendant Tarancon Corporation is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located in Lake City, Georgia. Defendant Gregorio Tarancon (hereinafter "Tarancon") is the president of Tarancon Corporation and resides in Morrow, Georgia. Tarancon was employed by Union Carbide from May, 1973 to December, 1984, when he voluntarily resigned from employment with Union Carbide.

### B. Fluorination

Plaintiff's '180 patent describes an apparatus for performing fluorination. Fluorination, a chemical reaction between fluorine and the surface of a container, creates a barrier on the surface of the treated container which reduces the permeability of the container to certain stored liquids. Fluorinating plastic containers allows the treated containers to hold various liquids such as gasoline, solvents, aerosols and propellants which would otherwise escape from untreated containers. Fluorination significantly increases the "shelf life" of many products sold in fluorinated containers. Fluorination is a commercially valuable process because it enhances "shelf life" and lessens the need for expensive metal or breakable glass containers.

Union Carbide began research and development of fluorination technology in 1970. Testimony of James Sommer. First, Union Carbide built a fluorination pilot plant at its Sterling Forest research facility located in Tuxedo, New York. Union Carbide spent approximately $4,000,000.00 developing fluorination at the Sterling Forest pilot plant.

In 1980, Union Carbide moved its fluorination pilot plant from Tuxedo, New York to a Union Carbide facility located in Keasbey, New Jersey. From 1980 through 1984, Union Carbide conducted research and development work on fluorination at the Keasbey facility. Union Carbide spent approximately $2,000,000.00 on a variety of tests of fluorination at the Keasbey facility.

### C. Gregorio Tarancon and the Development of Tarancon Corporation

Gregorio Tarancon, a chemical engineer, was hired by Union Carbide in May, 1973. While employed by Union Carbide, Tarancon was intimately involved with Union Carbide's fluorination research and development work. Tarancon was Manager, Process Plant Engineering, at the Keasbey facility from July, 1980 through December, 1984 when he voluntarily resigned from employment with Union Carbide.

During his tenure as Manager, Process Plant Engineering, Tarancon, in cooperation with marketing personnel, was responsible for directing the activities of Union Carbide engineering and technical personnel in the development of Union Carbide's fluorination processes and apparatus. As Manager, Tarancon supervised and was personally involved in putting together Union Carbide's fluorination apparatus. Tarancon and other Union Carbide marketing

personnel also set treatment conditions at Union Carbide's Keasbey pilot plant.

When he was hired by Union Carbide in 1973, Tarancon executed a "Memorandum of Employee's Agreement" in which he agreed to keep confidential and not to use or disclose any secret or confidential information of Union Carbide and to assign to Union Carbide all inventions he made in the course of his employment.

Tarancon executed a written acknowledgement of his obligations under his Memorandum of Employee's Agreement when he voluntarily resigned from employment with Union Carbide on December 14, 1984. The acknowledgement which Tarancon signed the day he resigned from Union Carbide specifically advised and invited Tarancon to contact Union Carbide with "any questions about the propriety of using or disclosing any particular information acquired from Carbide ... prior to use or disclosure."

Tarancon incorporated defendant Tarancon Corporation on December 13, 1984 while he was still an employee of Union Carbide. Tarancon now is the president and a director of Tarancon Corporation.

Less than two weeks after resigning from Union Carbide, Tarancon contacted Efrain Acevedo ("Acevedo"), a long time friend, and Abel Saud ("Saud"), the son of a major investor in Tarancon Corporation, for the first time regarding their possible cooperation with him in launching his new business venture.

Tarancon, Acevedo and Saud prepared a patent memorandum and filed a patent application on March 19, 1985, which resulted in the issuance of U.S. Patent No. 4,576,837 (the " '837 patent"). The '837 patent describes the basis of the fluorination process now being marketed by defendant Tarancon Corporation. The '837 patent has been assigned to defendant Tarancon Corporation.

Tarancon Corporation began business in Georgia in July, 1985. Tarancon had no experience in the research and development of fluorination processes prior to being employed by Union Carbide. However, Tarancon had been employed previously at a chemical company in Brooklyn, New York.

Tarancon had also worked as a consultant at New York University. Tarancon had worked with compounds such as silicon tetrafluoride and hydrogen fluoride. The court finds that, prior to his employment with Union Carbide, Tarancon had developed knowledge and skill in the field of highly reactive gases, including various fluorine compounds. When Union Carbide hired Tarancon, it was aware of his experience with fluorine compounds and with other toxic compounds.

Neither Acevedo nor Saud had any experience in fluorination prior to first meeting and discussing fluorination with Tarancon in late December, 1984. No laboratory experiments were performed by either Tarancon, Acevedo or Saud before the '837 patent application was filed. Tarancon developed and personally supervised construction of defendants' fluorination apparatus.

Neither Tarancon nor Tarancon Corporation requested or obtained any oral or written opinion from an attorney relating to infringement of plaintiff's '180 patent prior to the time this lawsuit was filed. In June, 1988, defendant Gregorio Tarancon made temporary modifications to defendants' fluorination apparatus. In October–November, 1988, permanent modifications were made to defendants' fluorination apparatus ("Defendants' Modified Apparatus"). Tarancon did not use any blueprints, schematics or diagrams in making either the temporary or permanent modifications which resulted in Defendants' Modified Apparatus.

Tarancon did not tell his attorney, Ezra Sutton, that defendants' fluorination apparatus and process had been modified until April, 1989. Defendants' Modified Apparatus uses more fluorine and is 30–40% more time consuming than was defendants' original apparatus.

Union Carbide has not licensed defendants or granted defendants authority to use any of the fluorination apparatus or processes covered by the '180 patent, nor has Union Carbide granted defendants any right, title or interest in and to said patent. Similarly, Union Carbide has not licensed defendants or granted defendants authori-

ty to utilize any of plaintiff's trade secrets and confidential business information pertaining to its fluorination apparatus and processes. Plaintiff alleges that defendants' activities have interfered with plaintiff's existing license agreements and with plaintiff's marketing of its fluorination technology to other potential licensees. The court finds that these allegations have not been supported by evidence at trial.

### D. Trade Secrets

At the Keasbey facility, Union Carbide also developed an alleged trade secret enhancement to its fluorination process. This alleged trade secret was designated the Multiple Dwell Fluorination Method ("MDFM"). MDFM is valuable because it facilitates the removal of hydrogen-fluoride, a very corrosive acid, from the reaction site, thus re-exposing the plastic surface to fresh fluorine.

Union Carbide marketed its commercial fluorination apparatus, processes and know-how to United States and foreign companies. The first licensee of the fluorination process was the Rheem Corporation of Ohio. Union Carbide then licensed its fluorination technology to the Rheem Company in Toccoa, Georgia. Subsequent licensees included Universal Barriers Corporation, as well as a West German company. Licensees were issued a twelve year license to use the fluorination technology in exchange for a royalty. The amount of the royalty was determined by the number of gallons of containers to be fluorinated.

### II. The Patent Issues

A patent is presumed to be valid. 35 U.S.C. § 282. The parties have not disputed the validity of the '180 patent. Accordingly, the court determines that the '180 patent is valid.

 Plaintiff claims that defendants have infringed U.S. Patent No. 3,998,180.[1] Union Carbide, as the patentee, bears the burden or proving infringement by a pre-

ponderance of the evidence. *Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282 (Fed.Cir. 1986); *SRI International v. Matsushita Electric Corporation of America*, 775 F.2d 1107, 1123 (Fed.Cir.1985). Initially, that burden is carried when literal infringement has been proved. *SRI International*, 775 F.2d at 1123, citing *Graver Tank & Manufacturing, Inc. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). Infringement, either literal or by equivalences, is determined by comparing the accused apparatus, process or device solely with the properly and previously construed claims. *SRI International*, 775 F.2d at 1121. The determination of literal infringement, i.e., whether the claims read on the accused device, is a factual inquiry. *See LaBounty Manufacturing, Inc. v. United States International Trade Commission*, 867 F.2d 1572, 1575 (Fed.Cir.1989). However, prior to determining whether the patents' claims encompass the accused structure, the court must first construe the patents' claims independently to determine their scope. *Id.* at 1574; *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1578 (Fed.Cir. 1988).

The claims of the patent are said to provide the concise formal definition of the patent. *Autogiro Company of America v. United States*, 384 F.2d 391, 395–96, 181 Ct.Cl. 55 (1967). The claims point out the subject matter which the inventor regards as his or her invention. *Id.*[2] Nonetheless, the reading of the claims should be tempered by consideration of patent specifications, drawings and the file wrapper. *Id.; See also Johns–Manville Corp. v. Guardian Industries Corp.*, 586 F.Supp. 1034, 1051 (E.D.Mich.1983), *aff'd without opinion*, 770 F.2d 178 (Fed.Cir.1985). Expert testimony is also relevant in determining the meaning of the claims. *See Perini America, Inc. v. Paper Converting Machine Co.*, 832 F.2d 581, 584 (Fed.Cir.1987).

---

1. 35 U.S.C. § 271(a) provides as follows: "[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."

2. 35 U.S.C. § 112 provides in part, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

The use of the various parts of the patent to determine the meaning of the claims is only half of the process of determining infringement. The second half is reading the claims on the accused structure. "If the alleged infringer's apparatus, process or product 'reads on' i.e., copies or duplicates, the claimed invention, 'literal infringement' is established." *Johns–Manville*, 586 F.Supp. at 1051. What follows below is the court's construction of Claim 1 of the '180 patent and subsequent determination of whether Claim 1 reads on defendants' apparatuses.

### A. *Literal Infringement*

■ The invention claimed in plaintiff's '180 patent is an apparatus for exposing articles to reactive gases to alter their surface characteristics. The apparatus is composed of two-chambers. Reactive gases can be moved back and forth between the chambers in a controlled way to provide a safe and practical treatment of the articles. '180 patent, col. 3, 1.1. 46–52.

The application for the '180 patent was filed on April 7, 1975. The '180 patent was issued on December 21, 1976. Prior to 1975, two methods and apparatuses were generally used to achieve fluorination. These were (1) the flow-through process and apparatus and (2) the single tank process and apparatus. '180 patent, col. 1, 1.1. 31–35; col. 2, 1.1. 17–20. One embodiment of the two-chamber system employs a reaction chamber and a holding chamber. Alternatively, the '180 patent can cover a two-chamber system having two reaction chambers. The inventors disclosed that the '180 apparatus is capable of providing a variety of process parameters. '180 patent, col. 7, 1.1. 12 to col. 8, 1. 30.

The structure of defendants' fluorination apparatus as originally built is not in issue. Defendants have stipulated that plaintiff's Exhibit 401 is an accurate schematic diagram of defendant's original apparatus. The structure of defendants' modified apparatus (as permanently modified in October and November, 1988) is not in issue. Defendants have stipulated that plaintiff's Exhibit 401A is an accurate diagram of defendants' modified apparatus. (The court will refer to defendants' original and modified apparatuses together as "defendants' apparatuses".)

Plaintiff maintains that Claim 1 of the '180 patent reads on defendants' apparatuses. Claim 1 is recorded as follows:

1. An apparatus for exposing articles to a gaseous fluid at an essentially predetermined composition wherein said fluid is comprised of or contains one or more components which are reactive with the surface of said articles, said apparatus comprised of in combination;

 a. a first sealed reaction chamber having sealable access means for the introduction and removal of said articles;

 b. a second sealed chamber having first conduit means connected to at least one source of said fluid and optional sealable access means for the introduction and removal or said articles, whereby said second chamber may optionally be utilized as only a holding chamber of said gaseous fluid or additionally as a second reaction chamber;

 c. a conduit system connecting said first and second chamber;

 d. vacuum producing transfer means and valve means operatively associated with said conduit system for selectively creating pressure differentials between said chambers, whereby each chamber may be evacuated or charged with said gaseous fluid, and fluids transferred back and forth between said chambers after the fluid treatment of said articles;

 e. said apparatus including pressure and temperature control means; and

 f. means operatively associated with said conduit system and adapted to separate out reaction by-products and contaminants.

('180 patent, col. 18, 1.1. 7–36).

### 1. Preamble to Claim 1

Defendants admit that their original apparatus literally meets every element recited in the Preamble of Claim 1 to the '180 patent. Moreover, the court finds that in

operating their original and modified apparatuses since December, 1985, defendants have operated an apparatus for the surface fluorination of articles in which (i) articles including plastic containers, are exposed (ii) to a fluorine/nitrogen gas mixture (iii) of a predetermined composition that (iv) alters and is reactive with the surface of the articles to which it is exposed. The court finds that both defendants' original and modified apparatuses literally meet every element recited in the Preamble to Claim 1. This finding is substantially supported by the expert testimony of Dr. John Muzzy, Professor at Georgia Institute of Technology's School of Chemical Engineering.

2. Claim 1, subparagraphs (a) and (b)

The '180 patent states that the chambers of the apparatus are "sealed". According to Matt O'Hara, one of the four named inventors of the '180 patent, the term "sealing" as used in the patent refers to sealing from the atmosphere. Dr. John Muzzy also testified that "sealed" as used in Claim 1 of '180 patent, refers to sealing from the atmosphere. Apparently, sealing the chambers from the atmosphere is necessary to keep the highly reactive and potentially toxic fluorine away from workers. In addition, sealing from the atmosphere minimizes waste of gases, which can be re-used. Defendants maintain, however, that the term "sealed" in the context of plaintiff's '180 patent means that the two chambers are sealed from each other. Both Dr. Muzzy and Mr. O'Hara testified that the '180 patent does not require that the two chambers of the fluorination apparatus be sealed from each other. The court finds that the term "sealed" as used in Claim 1 is properly construed to mean sealed from the atmosphere.

At least one of the reaction chambers recited in Claim 1 has sealable access means for the introduction and removal of articles. "Sealable access means" refers quite simply to doors on the reaction and/or holding chambers. One such sealable access means disclosed in the '180 patent is a door with a rubber sealing gasket. When open, the sealable access means allows access into the reaction chamber for introduction and/or removal of articles.

When closed or sealed, the access means is sealed from the atmosphere.

The court finds that each of defendants' fluorination apparatuses includes a first reaction chamber which has a sealable access means for the introduction and removal of articles. Dr. Muzzy pointed out the sealable access means on illustrations of both defendants' original and modified apparatuses.

The court also finds that both of defendants' fluorination apparatuses include two sealed reaction chambers (sealed from the atmosphere but not from the other chamber) as recited in subparagraphs (a) and (b) of Claim 1. Each of the two chambers is equipped with a sealable door. In a production run of defendants' original apparatus, the doors of the first and second chambers were opened, articles to be treated were loaded inside each chamber, the doors of each chamber were hydraulically closed and each chamber was thereby sealed to the atmosphere. Defendants' Modified Apparatus may also be operated this way.

The court finds that the two reaction chambers of defendants' apparatuses are "sealed" and have "sealable access means" as recited in subparagraphs (a) and (b) of Claim 1.

Fluorine may be introduced into the first and second chambers of defendants' fluorination apparatuses through conduit lines from fluorine transfer tanks by opening appropriate valves. The court therefore finds that the second sealed chamber of each of defendants apparatuses' has first conduit means connecting it to at least one source of fluorine gas as recited in subparagraph (b) of Claim 1.

The court determines that both of defendants' fluorination apparatuses meet every limitation of subparagraphs (a) and (b) of Claim 1.

3. Claim 1, subparagraph (c)

Defendants acknowledge that the first and second chambers of their original apparatus were connected by a conduit system. Dr. Muzzy identified the conduit systems on the original and modified apparatuses. The court finds that a conduit system con-

nects the two chambers of each of defendants' apparatuses; thus, both apparatuses meet the limitations for subparagraph (c) of Claim 1.

4. Claim 1, subparagraph (d)

Paragraph 6 of 35 U.S.C. § 112 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Subparagraph (d) contains "means plus function" language. Thus, the court must ascertain both the structure and function of the disclosed means.

> To determine whether a claim limitation is met literally where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure.

*Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931 (Fed.Cir.1987). After hearing arguments of counsel and testimony of experts, the court concludes that the compression/expansion system of defendants' apparatuses, namely the bi-directional blower, as well as associated valves and conduits, constitute the recited vacuum producing transfer means and valve means.

#### (a) *Means*

A vacuum, as defined by both Mr. O'Hara and Dr. Muzzy, is created when pressure is reduced to an amount less than one atmosphere or 760 Torr. The '180 patent allows that "any suitable means of creating a vacuum may be used" for the vacuum producing transfer means. The '180 patent expressly discloses a Rootes-type pump as a suitable vacuum producing transfer means. Dr. Muzzy testified that a Rootes-type blower is the functional equivalent of a Rootes-type pump. Dr. Muzzy also stated that defendants' bi-directional blowers essentially function as a Rootes-type blower.

The court finds that a Rootes-type blower or a bi-directional blower could also be a suitable vacuum producing transfer means. Thus, the court finds that defendants' bi-directional blower is the equivalent of the vacuum producing transfer means recited in subparagraph (d) of Claim 1.

#### (b) *Function*

The stated functions of the "transfer means and valve means" recited in subparagraph (d) are "vacuum producing" for the transfer means and "selectively creating pressure differentials between chambers" for both the transfer and valve means acting together.

The court finds that the meaning of "vacuum producing" in the '180 patent is creating pressure below 760 Torr. The court determines that the terms "selectively creating pressure differentials between said chambers" in their ordinary and customary sense mean causes the pressures in each chamber to be different. Nothing in the '180 patent requires the court to read "vacuum producing" or "selectively creating pressure differentials . . ." in any other than their usual sense. Testimony of Dr. Muzzy.

Defendants' original and modified apparatuses utilize blower B2 to move part of the gases back and forth between chambers RA and RB respectively. This movement of the gases selectively creates pressure differentials. Mr. O'Hara demonstrated for the court how Tarancon's original and modified operating techniques can be performed on Union Carbide's '180 apparatus to vary pressure between the two chambers.

Thus, the court finds that there is an identity of function between the bi-directional blower and associated conduits and valves of defendants' apparatuses and the "vacuum producing transfer means and valve means" recited in Claim 1, subparagraph (d) and described in the specification of the '180 patent. Both the vacuum producing transfer means in the '180 patent and the bi-directional blower of defendants' two apparatuses can create pressure differentials within the reaction chambers. The court finds that defendants' bi-directional

blower and associated conduits and valves are equivalent to the vacuum producing transfer and valve means recited in Claim 1, subparagraph (d).

### (c) "Whereby Clause"

Mr. O'Hara testified that the term "evacuate" as used in Claim 1, subparagraph (d) means the partial or nearly complete withdrawal of gas from a chamber. Dr. Muzzy testified that "evacuate" simply means to remove fluids from a chamber, thereby reducing the pressure in the chamber. The court adopts this definition of "evacuate".

As stated above, the court adopts a definition of "vacuum" as pressure below 760 Torr.

The court finds that the ordinary and customary meaning of a chamber being "charged" as used in Claim 1, subparagraph (d) is that the gas has been moved into the chamber. The court finds that "charged", "vacuum" and "evacuate" are used in accordance with their ordinary meanings.

Patent '180 discloses that the pressure in each chamber may be varied between 1 Torr. and 70ⁱ Torr. The examples listed in the '180 patent never describe the uses of varying pressures during one treatment episode. However, the patent does not include an exhaustive list of examples of uses for the apparatus. In column 5, 1.1. 22–34, an example is given of the chamber being evacuated to approximately 70 Torr. The '180 patent also discloses in Figure 2 an H-arrangement of pipes, valves and a pump that may be used to selectively cause a flow of gases into, out of and between the chambers as a result of differences in pressure between the chambers. At trial, plaintiff satisfactorily demonstrated that the '180 patent apparatus could employ varying pressures during one treatment episode if desired.

The court finds that in defendants' original apparatus, defendants did "evacuate" the reaction chamber to a pressure of 250 Torr. by moving gas out of that chamber while "charging" the second reaction chamber to a pressure of 500 Torr. by moving gas into the second chamber from the first chamber.

The court finds that defendants can similarly evacuate one reaction chamber of defendants' modified apparatus to a first pressure (below 760 Torr.) by moving gas out of that chamber while "charging" the second reaction chamber to a second higher pressure (also below 760 Torr.) by moving gas into the second chamber from the first chamber.

The court finds that in both of defendants' apparatuses each of the two chambers can be "evacuated" and "charged" with gas by the bi-directional blower and its associated conduits and valves. Gases can be transferred back and forth between the two reaction chambers of defendants' apparatuses by the bi-directional blower, as recited in Claim 1, subparagraph (d).

In the operation of defendants' original and modified apparatuses, articles to be treated can be placed within the two reaction chambers with the doors closed. Fluorine gas can then be introduced into the two chambers simultaneously and to equal pressures. The fluorine gas then remains in contact with the articles as nitrogen gas is added to both chambers. This process of adding the nitrogen is referred to as "spiking". In defendants' original apparatus the articles were, and in the modified apparatus can be, exposed to a constant quantity of reactive fluorine gas during nitrogen activity, which is usually a period of several minutes. The court finds that treatment of the articles takes place during this "spiking" phase.

After the fluid treatment that occurs during "spiking", the bi-directional blower and associated structure of defendants' apparatuses transfer the reaction gases back and forth between the two reaction chambers. The transfer of gases therefore occurs "after the fluid treatment" of the articles as recited in Claim 1, subparagraph (d).

Furthermore, the court finds that plaintiff's Exhibit 351, containing an excerpt from the affidavit of Gregorio Tarancon, discusses a "compression-expansion" cycle of gases which is identical to the process described in patent '180 Claim 1, subparagraph (d). In addition, Claim 1 of the Tar-

ancon '837 patent, describing the basis of the fluorination process originally marketed by Tarancon, discusses "re-establishing the first pressure of the gas in contact with the surface for a second period of time during which the reaction takes place again." ('837 patent, col. 4, 1.1. 54–57). Thus, the court finds that after each treatment step, except the last, gases are transferred back and forth between the two reaction chambers of defendants' original apparatus.

Defendants' modified apparatus is capable of being operated in the same way as defendants' original apparatus to achieve defendants' compression-expansion cycle. Therefore, the court finds that the modified apparatus is capable of being operated so that after each of the treatment steps, except the last, gases are transferred back and forth between the two reaction chambers.

The court finds that the clause "after the fluid treatment" means any time after the introduction of fluorine into a reaction chamber. Column 8, 1.1. 25–26. Patent '180 does not state a particular time period for treatment of objects with fluorine; in fact, the patent expressly states that time is not narrowly critical to fluorination.

In conclusion, the court finds that the bi-directional blower and associated conduits and valves of defendants' apparatuses constitute (i) a vacuum producing transfer means which is disclosed in or is equivalent to the structures disclosed in the '180 patent and (ii) such means perform or can perform the identical function to the structures disclosed in the '180 patent. Thus, the bi-directional blower and associated conduit and valves of defendants' apparatuses literally meet the "means plus function" limitation of subparagraph (d) of Claim 1.

### 5. Claim 1, subparagraph (e)

Defendants' fluorination apparatuses include pressure and temperature control means. The court therefore finds that defendants' apparatuses meet the limitations of subparagraph (e) of Claim 1.

### 6. Claim 1, subparagraph (f)

Subparagraph (f), like subparagraph (d), is stated in "means plus function" language. Plaintiff claims that subparagraph (f) discloses either a scrubber or a trap to separate out reaction by-products. Defendant maintains that subparagraph (f) only discloses a trap. Defendants argue strenuously that the '180 requires the separating out of by-products and contaminants through a trap, not through a scrubber. Thus, defendants maintain that since the Tarancon systems do not employ a trap, there is no literal infringement. Based on review of the specification, the drawings and the file wrapper, the court concludes after much deliberation that subparagraph (f) discloses either a scrubber alone or in conjunction with a trap.

#### (a) Means

Hydrogen fluoride (HF) is a toxic gas released as a by-product of the fluorination process. HF is an atmospheric contaminant. Unreacted fluorine gas also is emitted during the fluorination process.

The '180 patent includes a "means" to separate toxic by-products and contaminants from other effluent gases (such as nitrogen or oxygen) which also are emitted as part of the fluorination process.

The court finds that both HF and unreacted fluorine gas are considered by-products or contaminants within the meaning of Claim 1, subparagraph (f). Dr. Muzzy testified that both fluorine and hydrogen fluoride are toxic emissions.

The court finds that the '180 patent discloses structures to separate toxic by-products and contaminants from other emission gases. The structures disclosed in the '180 patent include a scrubber, used alone or in conjunction with a trap.

The court finds that both of defendants' apparatuses and plaintiff's '180 patent require operation of a scrubber. The court concludes that subparagraph 1(f) mandates the use of scrubber but does not necessarily require a trap.

Thus, the court further finds that the fact that defendants' apparatuses do not use a trap while plaintiff's apparatus some-

times may use a trap is of no moment. The disclosed "means" for performing the function in subparagraph 1(f) is not limited to an HF trap.

### (b) *Function*

The stated function of the means recited in subparagraph (f) is to "separate out reaction by-products and contaminants." Whenever the process for which the patented apparatus is being used produces toxic or undesirable waste gases, a separation means is necessary for safe non-polluting operation of the invention.

The court finds that defendants' scrubber separates out the hydrogen fluoride by-product and contaminants, including fluorine, from the emission gases of defendants' fluorination process, thereby releasing only the non-toxic components of those waste or emission gases into the atmosphere.

The court therefore finds that the function of defendants' scrubber in both of defendants' apparatuses fulfills that function recited in Claim 1, subparagraph (f) by separating out reaction by-products and contaminants.

Since the scrubber of defendants' apparatuses is a means to separate out reaction by-products and contaminants which is disclosed in the '180 patent, and performs the same function as the scrubber disclosed in the '180 patent, the court finds that the scrubber in defendants' apparatuses literally meets the "means plus function" limitation of Claim 1, subparagraph (f).

The court concludes that plaintiff has met its burden of proving literal infringement of the '180 patent. Every element of Claim 1 literally reads on both of defendants' apparatuses.

### B. *Reverse Doctrine of Equivalents*

■ In *Graver Tank,* the Supreme Court noted that:

[t]he wholesome realism of the doctrine [of equivalents] is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement.

339 U.S. at 608–09, 70 S.Ct. at 856.

When a patentee has carried the burden of proving infringement by a preponderance of the evidence, the accused infringer may undertake the burden of "going forward to establish the fact of non-infringement under the reverse doctrine of equivalents." *SRI International,* 775 F.2d at 1124. If the accused infringer can establish a prima facie case, the patentee who bears the burden of persuasion on infringement, must then rebut the prima facie case. *Id.* The reverse doctrine of equivalents is seldom offered "[b]ecause products on which patent claims are readable word for word often are in fact the same, perform the same function in the same way, and achieve the same result, as the claimed invention." *Id.* at 1123 n. 19.

■ The court finds that the defendants have not met their burden of establishing a prima facie case of non-infringement under the reverse doctrine of equivalents. One who takes a claimed apparatus and merely uses it in a way that differs from that in which a specification-described embodiment uses it does not thereby escape infringement. *Id.*

The principle behind the '180 patent apparatus is to expose articles to a reactive gas in a two-chamber apparatus and provide means to move the gases within the chambers back and forth between the two chambers. The court finds that the principle of each of defendants' apparatuses is identical to that of the '180 patent.

### C. *Willful Infringement*

■ Plaintiff asserts that defendants' infringement of the '180 patent was willful. A finding of willful infringement is a finding of fact. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 628 (Fed.Cir.1985); *Underwater Devices Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1389 (Fed.Cir.1983). Plaintiff bears the burden of proving willfulness by clear and convincing evidence. *Id.*

In a pair of landmark decisions in 1983, the Court of Appeals for the Federal Circuit[3] stressed that a person with knowledge of a patent has a duty to exercise due care to determine whether she will infringe valid patent rights before the initiation of possibly infringing activity. *Underwater Devices*, 717 F.2d at 1380; *Central Soya Company, Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573 (Fed.Cir.1983). "That affirmative duty will normally entail the obtaining of competent legal advice of counsel before infringing or continuing to infringe...." *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1109 (Fed.Cir. 1986). However, while failure to seek and follow the instructions of a competent patent lawyer may support a finding of willfulness, it is but one factor that must be considered with the totality of the circumstances. *Id.; American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459 (Fed.Cir. 1985).

The weight that should be placed on the presence or absence of an exculpatory opinion of counsel varies with each case. *Rite–Hite Corp v. Kelley Company, Inc.*, 819 F.2d 1120, 1125 (Fed.Cir.1987). As the court stated in *Machinery Corporation of America v. Gullfiber AB*, 774 F.2d 467, 472 (Fed.Cir.1985),

> [t]here is no *per se* rule that an opinion letter from patent counsel will necessarily preclude a finding of willful infringement, ... nor is there a *per se* rule that the lack of such a letter necessarily requires a finding of willfulness.... In ascertaining an alleged infringer's state of mind, a district court must look at the totality of the circumstances in determining willfulness.

Thus, in determining whether infringement was willful, courts have also considered factors such as whether the alleged infringer attempted to "design around" the patent, *Rolls–Royce*, 800 F.2d at 1109, whether the patent owner notified the alleged infringer of the charge of infringement prior to filing the suit, *American Original Corp.*, 774 F.2d at 459, and whether the alleged infringer mounted a good faith

challenge to the existence of infringement. *Id.*

In the case at hand, there is no dispute that Gregorio Tarancon had knowledge of plaintiff's '180 patent. Tarancon had worked at Union Carbide's Keasbey pilot plant and was instrumental in the development of Union Carbide's current fluorination technique. Knowledge of the '180 patent can also be imputed to Tarancon Corporation through Gregorio Tarancon. As the cases outlined above teach, an individual who has knowledge of another's patent rights has a duty to exercise due care not to infringe those rights. Defendants should have consulted a patent attorney for an explicit opinion as to whether their apparatuses infringed the '180 patent prior to operation of the apparatuses. Defendants did not do so. However, as noted above, whether defendants garnered the opinion of counsel is just one factor the court should consider.

The court finds several other factors in this case that mitigate against a finding of willfulness. First, the court finds that defendant Tarancon held an honest belief that his activities fell within his own patentably distinct claims. On both direct and cross examination the court found Mr. Tarancon a credible witness who felt his method of fluorinating plastics at a continuously varying pressure was unique. While this belief may be irrelevant to an infringement analysis, it can be considered by the trier of fact in determining intent "in connection with a decision of willfulness *vel non.*" *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed.Cir.1985). Whether an act is willful is by definition a question of the actor's intent. *Gustafson Inc. v. Intersystems Industrial Products Inc.*, 897 F.2d 508 (Fed.Cir.1990). Mr. Tarancon testified that the basic principle of his '837 patent was that it allowed for the cycling of pressures between high and low levels during fluorination. Tarancon stated that this cycling of pressures was new in the fluorination field. The court finds that Tarancon

---

**3.** In 1982, the Court of Appeals for the Federal Circuit was created with exclusive jurisdiction over patent law cases.

honestly believed that his apparatuses did not infringe the '180 patent because they promoted the principal of cycling pressures. The examples listed in the '180 patent never described the use of varying pressures in one treatment episode. While the court ultimately found that the '180 could, in fact, employ varying pressures in one episode, such was not the normal or preferred embodiment of the '180 patent. The court finds that Mr. Tarancon honestly believed that his cycling technique was novel and did not infringe plaintiff's apparatus patent.

In addition, the court finds that Mr. Tarancon believed he was protected from an infringement suit when he obtained the '837 patent. While the court recognizes that Tarancon's '837 patent provided him no legal protection from an infringement action, *Rolls–Royce*, 800 F.2d at 1110, n. 9, Tarancon's belief that he was protected is evidence that the infringement was not willful. The testimony at trial demonstrated that when Tarancon applied for his '837 patent, with the assistance of a patent attorney, Robert Green, he gave Green copies of the '180 patent and other patents he felt were relevant. The court finds that Tarancon was aware of the possibility of infringement and believed that his consultation with Green would inform him of potential infringement activity. Tarancon testified that after he received notice that his fluorination method had been patented under the '837 patent, he believed that he had no possibility of infringing plaintiff's patent. As defendants' expert, Dr. Omri Behr, testified, most lay people believe that once they receive a patent, their invention has been held unique *and* non-infringing. Lay persons are often surprised by the idea of that they can still be responsible for infringing another dominating patent. The court finds that Mr. Tarancon held a good faith belief that he was protected against infringement when he received the '837 patent.

The court also notes that defendants presented a strong case against a finding of literal infringement of the '180 patent, particularly on subparagraphs (d) and (f) of Claim 1. The court decided that defendants infringed the '180 patent only after careful study. Defendants' strong defense against a finding of literal infringement indicates that this was not a mere "copy-cat" case.

Finally, the court finds that prior to the commencement of this action, Union Carbide failed to warn defendants of any possible infringement of Union Carbide patents.

When invoking the totality of the circumstances analysis to determine whether infringement is willful, the court must not be bound be hard and fast rules. *Rolls–Royce*, 800 F.2d at 1109. The court should consider the contours unique to each case. *Id.* After hearing Mr. Tarancon's and Dr. Behr's testimonies, the court concludes that defendants did not willfully infringe plaintiff's '180 patent. The evidence shows that defendants did not intentionally copy plaintiff's patent but that they tried to design around it. Thus, although the apparatuses built by defendants infringed plaintiff's '180 patent, the record here does not support a finding that such infringement was "willful, wanton, deliberate and knowing". *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 625 F.Supp. 343, 355 (E.D.Mich. 1985) *aff'd*, 800 F.2d 1101 (Fed.Cir.1986).

### D. Attorney Fees

#### 1. Plaintiff's Fees

■ The patent statute authorizes the court "in exceptional case [to] award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The district court should exercise its discretion to award attorney fees only upon a specific finding of exceptional circumstances. *See Bott v. Four Star Corp.*, 807 F.2d 1567, 1574 (Fed. Cir.1986). A finding of willful infringement is often a legally sufficient criterion for deeming a case "exceptional." *Id.; Del–Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1329 (Fed.Cir. 1987); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed.Cir. 1989).

Plaintiff seeks to recover attorney fees under 35 U.S.C. § 285 on the grounds that defendants willfully infringed the '180 patent. The court finds, however, that defendants' infringement was not willful. Plain-

tiff cannot recover attorney fees on the grounds that the case is exceptional because of defendants' willfulness. Plaintiff has not requested attorney fees based on other grounds such as inequitable conduct before filing of the pretrial order, misconduct during litigation or vexatious or unjustified litigation. *See Beckman Instruments,* 892 F.2d at 1547. Furthermore, the court finds no evidence of any such factors which would make this case exceptional and justify an award of attorney fees.

### 2. Defendants' Costs

 By order dated July 18, 1988, the court granted plaintiff permission to withdraw its claim for infringement of its United States Patent No. 4,081,574. The court also allowed plaintiff to delete those portions of the original complaint in which it sought an accounting and award of the profits allegedly realized by defendants as a result of their allegedly unlawful activities, plaintiff's lost profits and an award of treble damages and punitive damages. The court conditioned these amendments to the complaint on plaintiff paying defendants' costs incurred in preparing to litigate the withdrawn claims. The parties stipulated subsequently that defendants should receive thirty-three per cent of their costs for this period. Defendants now seek recovery of thirty-three per cent of *attorney fees* and other expenses incurred between September 24, 1986 and July 12, 1988. However, the court's order of July 18, 1988 predicated the withdrawal of plaintiff's claims only on the payment of *costs.* Defendants are not entitled to an award of attorney fees, but they may recover thirty-three per cent of their costs incurred between September, 1986 and July 12, 1988. The total of costs for this period is $24,834.81. Accordingly, defendants are entitled to an award of costs in the amount of $8,195.49.[4]

### IV. *Trade Secrets*

 Plaintiff alleges that its multiple dwell fluorination method constitutes a trade secret protected under Georgia law. Plaintiff asserts that defendants wrongfully misappropriated the MDFM trade secret in Claim 1 of '837 patent.

MDFM is a special method of treating plastic containers which was allegedly developed at the Keasbey Pilot Plant. MDFM consists of the following steps:

a. Allowing a fluorine and nitrogen gas mixture to contact and react with the surfaces of the containers being treated for a predetermined dwell period at a specified pressure;

b. Reducing the pressure in the reaction chamber by withdrawing the fluorine and nitrogen gas mixture and reaction by-products (collectively, "the gases") out of the reaction chamber;

c. Transferring the gases back to the reaction chamber to again allow the gases to contact and react with the surface of the containers being treated for a predetermined dwell period at a specified pressure;

d. Again reducing the pressure in the reaction chamber by withdrawing the gases out of the reaction chamber; and

e. Repeating steps 1–4 until the desired treatment is obtained.[5]

The invention described in Claim 1 of the '837 patent is:

1. The method of treating a surface comprising the steps of providing a gas in contact with the surface to be treated at a first pressure for a period of time, during which a chemical reaction takes place at the surface, reducing the pressure of the gas in contact with the surface to be treated for a second period or time, during which reaction by-product (sic) are removed, re-establishing the first pressure of the gas in contact with the surface for a

---

**4.** Plaintiff, as prevailing party on the infringement claim, is entitled to an award of its costs incurred in litigating that claim.

**5.** The court notes that the MDFM was reduced to writing for the purposes of this litigation. There is no evidence that while Tarancon was working for Union Carbide the MDFM had been expressed in this written form.

period of time during which the reaction takes place again,

again reducing the pressure of the gas in contact with the surface for a period of time during which reaction by-product (sic) are removed, and

continuing the cycle of the first pressure and the reduced pressure until the surface has the desired characteristics.

('837 patent, col. 64, 1.1. 48–61).

The first issue the court must consider is whether plaintiff's MDFM constitutes a trade secret under Georgia law. Under Georgia law, a trade secret is defined as follows:

(a) A trade secret means information including, but not limited to, technical or nontechnical data, a formula pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customer or suppliers which:

(1) Derives economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Georgia courts recognize that trade secrets are valuable and protectable rights. Prior to the enactment of O.C.G.A. § 10–1–760 on July 1, 1989, Georgia case law provided that a trade secret was protectable as a property right where (1) it was sufficiently concrete in its development to be usable, *Morton B. Katz & Associates, Ltd. v. Arnold,* 175 Ga.App. 278, 280, 333 S.E.2d 115 (1985); *Shanco International, Ltd. v. Digital Controls, Inc.,* 169 Ga.App. 184, 312 S.E.2d 150 (1983); (2) it was novel and original and of value, *Wilson v. Barton & Ludwig, Inc.,* 163 Ga.App. 721, 296 S.E.2d 74 (1982); *Taylor Freezer Sales Co. v. Sweden Freezer Eastern Corp.,* 224 Ga. 160, 160 S.E.2d 356 (1968); and (3) it was not generally known in the trade.

The court finds that MDFM, as a process rather than a written formula, was known only to Union Carbide personnel and to those companies to whom its was disclosed by Union Carbide prior to defendants' disclosure of the trade secret in the '837 patent application, March 19, 1985. MDFM was not generally known in the world of commercial fluorination. The court finds that MDFM was sufficiently concrete to be usable by Union Carbide employees and Union Carbide licensees. MDFM is a part of the fluorination technology which Union Carbide licensed to third parties, such as Union Carbide licensee, Universal Barrier Corporation. Licensees paid Union Carbide for its technology, including MDFM. Universal Barrier Corporation employed a fluorination system that utilized an MDFM technique called "Huff and Puff". The court finds that MDFM was valuable to Union Carbide; Union Carbide derived profits from licensing MDFM to third parties. In sum, the court finds that MDFM constituted a protectable trade secret under Georgia law. *See Morton B. Katz & Associates,* 175 Ga.App. at 280, 333 S.E.2d 115.

The next issue for the court to decide is whether MDFM was disclosed in defendants' '837 patent. The court finds that each step in the method of Claim 1 of the '837 patent corresponds to the steps of plaintiff's MDFM process. The court relies on the testimony of plaintiff's expert Dr. Muzzy in reaching this conclusion. Claim 1 of the '837 patent recites the steps necessary to achieve the removal of by-products from surfaces being treated, which is plaintiff's MDFM trade secret.

The court must consider, then, whether defendants misappropriated Union Carbide's MDFM trade secret by disclosing it in the '837 patent. In order to prove misappropriation of its trade secret, plaintiff needs to show that defendants adopted and made use of a trade secret which was disclosed by the plaintiff in confidence. *Morton B. Katz & Associates,* 175 Ga.App. at 280, 333 S.E.2d 115. The court finds that Tarancon learned of and practiced the MDFM while working for Union Carbide. As a Union Carbide employee, Tarancon had agreed not to disclose Union Carbide trade secrets. The court holds further that Tarancon did not recognize that the MDFM, as practiced at Union Carbide, constituted a trade secret. When Tarancon

left Union Carbide, he reduced his idea for treating plastics at varying pressures into a written application for the '837 patent. Tarancon believed his idea was novel and differed from the MDFM practiced at Union Carbide. The '837 patent varied slightly from Union Carbide's MDFM, in that it did not disclose "spiking" with nitrogen. However, nothing stops the '837 patent from being used with nitrogen. The court therefore holds that defendants's '837 patent disclosed the MDFM trade secret.[6]

## V. *Breach of Contract*

█ Plaintiff claims that defendant Gregorio Tarancon breached his contractual obligation not to disclose Union Carbide's trade secrets by disclosing and claiming plaintiff's MDFM trade secret in Claim 1 of the '837 patent. Plaintiff also asserts that defendant Tarancon Corporation induced Gregorio Tarancon to breach his contract.

█ It is undisputed that Gregorio Tarancon as an employee of Union Carbide entered an agreement of confidentiality with Union Carbide. Tarancon executed a "Memorandum of Employees's Agreement" when he was hired in 1973. He agreed to keep confidential and not to use or disclose any secret or confidential information of Union Carbide. He also agreed to assign to Union Carbide all inventions he made in the course of his employment. Tarancon also secured a written acknowledgment of his obligation under his Memorandum of Employee's Agreement when he voluntarily resigned from his position with Union Carbide on December 14, 1984. This written acknowledgment advised Tarancon to contact Union Carbide with "any questions about the propriety of using or disclosing any particular information acquired from Carbide ... prior to use or disclosure." The court holds that Tarancon breached his contractual obligation not to disclose Union Carbide's trade secret.

However, the court notes that the breach of contract was not malicious or willful; Tarancon honestly believed his '837 patent covered a unique development. The court finds no evidence supporting the claim that Tarancon Corporation induced Gregorio Tarancon to breach his contractual obligations.

## VI. *Unfair Competition*

█ Plaintiff also claim that defendants have engaged in unfair competition. Plaintiff cites no Georgia authority supporting this claim. In *Johns–Manville*, 586 F.Supp. at 1073–74, the court stated that:

> The concept [of unfair competition] is designed to reach confidential matters and fiduciary relations which do not fit within the formal categories of either trade secret or patent protection, yet nevertheless constitute an advantage wrongfully appropriated by defendant.

At trial, plaintiff did not introduce any evidence specifically supporting its claim of unfair competition, independent from evidence supporting its patent or trade secrets claims. In fact, in its Proposed Conclusions of Law, plaintiff mentions only defendants' infringement of the '180 patent and misappropriation of the MDFM trade secret as grounds for a finding of unfair competition. The court does not hold defendants have engaged in unfair business practices giving rise to a cause of action distinct from plaintiff's misappropriation of trade secrets claim and patent infringement claims.

## VII. *Tortious Interference with Prospective Contractual Relations*

█ Plaintiff claims that defendants have tortiously interfered with plaintiff's contractual relations. The elements of plaintiff's cause of action are:

1. Existence of contractual relations;

2. Defendants' knowledge of such relations;

---

**6.** The court notes that a finding of misappropriation of trade secrets does not require a finding of willfulness by defendants. All that plaintiff must prove is that defendants disclosed a trade secret revealed to defendants in confidence. Plaintiffs have not here established that defendants maliciously or willfully revealed Union Carbide's trade secret. To the contrary, the court finds that defendants were unaware that the '837 patent could be considered to disclose confidential Union Carbide information. The court's holding on plaintiff's misappropriation of trade secrets claim therefore had no bearing on plaintiff's willful patent infringement claim.

3. Malicious interference by defendants;

4. Resulting damage to plaintiff's contractual relations.

*Stamps v. Ford Motor Co.,* 650 F.Supp 390 (N.D.Ga.1986). The court finds that plaintiff has failed to demonstrate that defendants' activities constituted malicious interference or that plaintiff suffered damage to its contractual relations. Plaintiff has submitted proposed conclusions of law which have not been supported by evidence introduced at trial. Accordingly, the court holds that plaintiff has failed to establish tortious interference with contractual relations.

CONCLUSION

The court finds that defendants literally infringed plaintiff's '180 apparatus patent. The court finds that the infringement was not willful. The court finds that plaintiff has not demonstrated that this case is exceptional within the meaning of 35 U.S.C. § 285. Accordingly, plaintiff is not entitled to an award of attorney fees under 35 U.S.C. § 285.

The court holds that plaintiff's multiple dwell fluorination method constituted a trade secret, protected by Georgia law. The court holds further that defendants misappropriated plaintiff's trade secret by disclosing the MDFM in the '837 patent. Union Carbide is entitled to have the '837 patent assigned to it. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226 (Fed.Cir. 1989).

The court also determines that defendant Gregorio Tarancon breached his contractual duty not to disclose Union Carbide's trade secrets.

The court does not find either common law unfair competition or tortious interference with contractual relations by defendants.

The court ENJOINS defendants from any further use of their original or modified fluorination apparatuses and from any other further infringement of the '180 patent. The court ENJOINS defendants from any further use of the MDFM trade secret. The court ORDERS defendants to transfer to plaintiff the '837 patent.

Plaintiff is entitled to its costs (not including attorney fees) as prevailing party on the patent claim. Defendants are entitled to thirty three percent of the costs (not including attorney fees) they incurred litigating the claims withdrawn by plaintiff pursuant to the court's order of July 18, 1988.

This order terminates the above-styled action.

So ORDERED.